# EXHIBIT

# 1

SMALL BUSINESS ADMIN 404 331 0244 P.01/01

OMB No:3245-0007
EXP. DATE: 08-31-2003
See Reverse Side for Public Comment Information

U.S. SMALL BUSINESS ADMINISTRATION

# SURETY BOND GUARANTEE AGREEMENT

1. By its authorized signature in Block 16 on the date stated in Block 18, SBA agrees to guarantee the bond(s) described herein as of the time of the issuance, as defined in 13 CFR 115.4, subject to the regulations in 13 CFR 115. SBA guarantees 80 % (not to exceed 80%) of the loss, in consideration, among other things, for $____ on each $1000 of the bond or contract amount, according to surety's own premium base.

2. Surety Name: American Contractor's Indemnity Co.

3. Principal's Trade Name: DiGiovanni Insulation & Refractory Inc.

4. Surety Underwriter's Name: Machael S. Zwart

5. Principal's Trade Address: Street 251 Garden River Ridge LA 70123
Codes: City, State, Zip and County

6. Principal's Name: Janet DiGiovanni

7. CONTRACT—Description of nature and extent (volume) of work, location, starting date and anticipated completion date: Alterations & Additions to two story building to include resturant chinese + office warehouse (start 10/1/02 – 6/30/03) Location 1601 St Charles Ave New Orleans LA 70130

8. Obligee (include address): Steve Ho 3813 N Arnault Rd Metairie LA 70002

9. Estimated Contract Amount: 1,781,850.00

10. Contract: ☐ Bid: Date & Time ☒ Negotiated

11. Bonds Required: ☐ Bid ☒ Payment ☒ Performance

12. Ancillary Bond(s): ☐ Yes ☒ No If yes, Explain:

13. Bond Amount (%): Bid ___ 100% Payment 100% Performance

14. Signature of Surety's Attorney-in-Fact: [signature]
Typed Name:

15. Date: 9-12-02

16. SBA Signature: [signature]
Typed Name: Frank E. Hagan
Disposition: ☒ Approved ☐ Returned/Withdrawn ☐ Declined

17. Title: ADD/Economic Development

18. Date: 09/27/02

Items (19-26) to be completed only for contracts awarded and final bond guarantee requests

19. Date of Contract Award: 09-13-02

20. Contract Amount: $1,780,850.00

21. SBA Guarantee Fee From Contractor $ (remitted herewith) 10,692.00

22. Bond Amounts: Bid $ ___ Payment $1,781,850.00 Performance $1,781,850.00

23. Based on: ☐ Bond Amt ☒ Contract Amt
Premium Charged By Surety: $ 32,073.00 % 1.8

24. Surety's Bond Number(s): Payment # 160555 Performance # 160555

25. Project for: ☐ Federal ☐ State ☐ Special District ☒ Private ☐ Local ☐ Other

26. If awarded job was bid, BID SPREAD: Low $ ___ 2nd Low $ ___ 3rd Low $ ___ [illegible] $ ___

27. SBA's SBG No. w/Suffix: 02-E721110070-0001

28. Date Received: 09-[illegible]-02

EXHIBIT 1

American Contractors Indemnity Company
9841 Airport Blvd., 9th Floor · Los Angeles, CA 90045
Phone: (310) 649-0990 · Facsimile: (310) 649-0416

# GENERAL INDEMNITY AGREEMENT

This General Indemnity Agreement is made and entered into this 20 day of August, 2002 by and between the Undersigned for the purpose of indemnifying Surety as herein defined, in connection with any Bond as herein defined written on behalf of

Digiovannis Insulation & Refractory, Inc.

herein included in the definition of "Principal."

1. DEFINITIONS -- The following definitions apply in this Agreement:

1.1 Surety: American Contractors Indemnity Company, its affiliates, subsidiaries, or reinsurers, and any other person or entity which the Surety may procure to act as a Surety or as a Co-Surety on any Bond, or any other person or entity who executes a Bond at the request of Surety.

1.2 Principal: The person or entity set forth above or any one of them or any combination thereof, or their successors in interest, whether alone or joint venture with others named herein or not. Said definition of Principal shall also include, without limitations, one or more of the Undersigned, if a Bond is executed by Surety on behalf of such Undersigned, and any other person, firm, or entity whose name shall have been furnished to Surety by any of the Undersigned, and accepted by Surety as a Principal pursuant to the terms of this Agreement.

1.3 Contract: Any Agreement of Principal, including that which is bonded by the Surety.

1.4 Bond: Any contractual obligation undertaken by Surety for Principal, before or after the date of this Agreement, and any renewal, modification, extension or substitutions of said obligation.

1.5 Undersigned: The parties, whether as Principal or as an Indemnitor, who have executed this Agreement, or who have adopted or assumed this Agreement, or the obligations of this Agreement.

2. INDEMNITY – In consideration of the execution and delivery by the Surety of a Bond or any Bonds on behalf of the Principal, the Undersigned agree to indemnify and hold the Surety harmless from and against any and all demands, liabilities, losses, costs, damages, attorneys' fees and expenses of whatever kind or nature together with interest thereon at the maximum rate allowed by law, which arise by reason of, or in consequences of, the execution by the Surety of any Bond on behalf of the Principal and whether or not the Surety shall have paid any sums in partial or complete payment thereof, including but not limited to:

2.1 Sums paid including interest thereon at the maximum rate allowed by law, or liabilities incurred in the settlement or the adjustment of any and all claims, demands, damages, costs, losses, suits, proceedings, or judgements;

2.2 Expenses paid or incurred in connection with claims, suits, or judgements under such Bonds;

2.3 Expenses paid or incurred in enforcing the terms of this Agreement;

2.4 Expenses paid or incurred in procuring or attempting to procure release from liability under its Bond by Surety;

2.5 Expenses incurred in recovering or attempting to recover losses or expenses paid or incurred;

2.6 Attorney's fees and all legal expenses related to any items herein, including in-house attorney's fees, costs and expenses; investigation, accounting or engineering services;

2.7 Premiums on Bonds issued by surety on behalf of the Principal;

2.8 Monies advanced or loaned under this Agreement.

3. EXERCISE OF RIGHTS – In furtherance of such indemnity:

3.1 Surety shall have the right in its sole and absolute discretion to determine whether any claims under any Bond or Bonds shall be paid, compromised, adjusted, defended, prosecuted or appealed.

3.2 Surety shall have the right to incur such expenses in handling a claim as it shall deem necessary, including but not limited to the expenses for investigative, accounting, engineering and legal services.

3.3 Surety shall have the foregoing rights, irrespective of the fact that the Undersigned may have assumed, or offered to assume, the defense of the Surety upon such claim.

3.4 In any claim or suit hereunder, an itemized statement of claims or losses paid or liabilities incurred or expenses paid or incurred, declared under penalty of perjury to be true and correct by an officer or Surety, or the vouchers or other

EXHIBIT 2

Indemnitor to initial each page    Initial ____

evidence of disbursement by Sur[illegible] shall be prima facie evidence of the fact and extent of the liability hereunder of the Undersigned.

3.5 Surety shall have the right to reimbursement of its expenses, premiums and attorney's fees, including in-house attorney's fees, costs and expenses hereunder, irrespective of whether any Bond loss payment has been made by Surety. In any suit on this Agreement, Surety may recover its expenses and attorney's fees, including in-house attorney's fees, costs and expenses incurred in suit.

3.6 At the sole and absolute discretion of Surety, upon written notice to the Undersigned, the Undersigned shall defend surety, at the Undersigned's sole cost and expense, and with counsel acceptable to Surety, in any suit, action or other proceeding initiated with respect to any Bond issued by Surety.

4. DEFAULT – Principal and the Undersigned shall be in default hereunder if any if the following occur:

4.1 Principal breaches, fails to perform, abandons or repudiates any Contract or is declared by any obligee to be in Default on any Bond issued by Surety.

4.2 The breach of this Agreement by the Principal or any of the Undersigned.

4.3 Principal fails to pay for any labor or materials when such payment is due.

4.4 Principal fails to pay for any labor or materials from one Contract to another, or to any person or entity prior to the complete discharge of Surety.

4.5 The voluntary or involuntary cessation or suspension of work required to be performed by Principal in connection with any Contract.

4.6 The filing or recording of a Mechanic's or similar lien against real property or delivery or filing of a Stop Notice, or other claim document, to the Project Owner, or to a lender having a security interest in any real property by any person or entity, including, but not limited to, suppliers and employees of subcontractors, trustees of union benefit plans or other claimants authorized under applicable provisions of State or Federal laws with regard to any Contract.

4.7 Principal or any one of the Undersigned, becomes the subject of any agreement or proceedings of composition, insolvency, bankruptcy, receivership, trusteeship, assignment for creditors, or becomes insolvent.

4.8 Principal or any of the Undersigned, who are individuals, dies, is adjudged mentally incompetent, convicted of a felony, becomes a fugitive from justice or disappears and cannot be located with the usual methods.

4.9 The failure of the Principal or Undersigned to furnish promptly accurate, complete and up-to-date financial statements upon request of Surety or the furnishing of a financial statement by Principal or any of the Undersigned which contains any materials misstatement or misrepresentation.

4.10 Any material adverse change in the financial condition of the Principal or any of the Undersigned.

4.11 The filing of any suit or the commencement of any action or proceeding by a creditor of the Principal or any of the Undersigned including by an obligee on any Bond issued by Surety.

4.12 Any suspension, revocation or other material adverse change in the status of any license of Principal with any applicable license board or agency.

5. REMEDIES UPON DEFALT—In the event of a Default, as defined above, Surety at its sole and absolute discretion is authorized by the Undersigned:

5.1 To file suit to enforce the provisions of the Agreement.

5.2 To take possession of any work to be performed pursuant to any Contract, and at the expense of the Undersigned, to complete the performance required by any Contract or cause the same to be completed or to consent to the completion thereof and to take any other action which Surety may deem appropriate, including without limitation utilizing Principal's current or other subcontractors and material suppliers as Surety may elect.

5.3 To take possession of the Undersigned's equipment, materials, supplies, books and records at the site of the work or elsewhere, and to utilize the same for completion of any Contract or for any purpose which Surety deems appropriate or necessary.

5.4 To have disbursed to Surety as attorney-in-fact of the Undersigned any construction loan proceeds allocated towards the payment of the
cost of any work to be performed under any Contract.

5.5 If the work required to be performed under any Contract is upon real property owned by the Undersigned, then Surety shall also have the right to take possession of said real property.

5.6 To make or guarantee advances or loans in the Surety's sole and absolute discretion in connection with any Contract, without any obligation or responsibility as to the application thereof, it being expressly understood and agreed that the amount of all such advances or loans shall be conclusively presumed to be a loss hereunder for which the Undersigned is liable irrespective of the prospects for repayment thereof or the security therefore.

... the remedies specified in this paragraph shall be in addition to any other remedies conferred upon Surety by this Agreement, by law or otherwise ... y shall have the right to enforce one ... remedies conferred upon Surety, successfully or concurrently, ... the exercise of any one remedy shall not pre... the exercise of any other.

6. COLLATERAL SECURITY – If a claim is made against Surety, whether disputed or not, or is Surety deems it necessary to establish a reserve for potential claims, and upon demand from Surety, the Undersigned shall deposit with Surety cash or other property acceptable to Surety, as collateral security, in a sufficient amount to protect Surety with respect to such claim or potential claims and any expense or attorneys' fees. Such collateral may be held or utilized by Surety, (i) until it has received evidence of its complete discharge from such claim or potential claims, (ii) until it has been fully reimbursed for all loss, expenses, attorneys' fees and unpaid premiums; and (iii) until it has been fully discharge with regard to any liability in connection with any Bond issued by Surety. If said collateral, or collateral previously deposited with Surety, is deemed insufficient by Surety, the Undersigned agrees to deposit additional or substitute collateral in an amount and type acceptable to Surety. This may include the Surety's demand for cash collateral in substitution for Trust Deed collateral. The Undersigned further agree to reimburse the Surety for all attorney's fees, costs, expenses, etc., including any in-house attorney's fees, in the Surety's defense of any action brought by the Undersigned or anyone to effect the return or turnover of the collateral.

7. ASSIGNMENT – As security for the performance of all the provisions of this Agreement, the Undersigned hereby assign, transfer, pledge and convey to the Surety effective as of the date of each such Bond or Bonds, but only in the event of Default as herein defined all rights in connection with any Contract, including but not limited to:

7.1 All subcontracts let in connection therewith and such subcontractors surety bonds.

7.2 All machinery, equipment, or tools, which shall be upon the site or sites of the work or elsewhere for the purpose of any Contract, including all material ordered for any Contract.

7.3 Any and all sums due or which may thereafter become due under any Contract and all other sums due or to become due on all other contracts, bonded or unbonded, in which any of the Undersigned have an interest.

7.4 All rights arising out of insurance policies, notes and accounts receivable, claims of ay kind and court actions.

7.5 Any and all undisbursed loan funds, deposits or interest reserve accounts to which the Undersigned may be entitled, and any and all collateral for the undertakings given by the Undersigned in connection with any Contract.

8. POWER OF ATTORNEY – The Undersigned hereby irrevocably nominate, constitute, appoint and designate the Surety or its designee as their attorney-in-fact with the power, but not obligation, to exercise all of the rights assigned, transferred and set over to the Surety by the Undersigned in this Agreement, and to make, execute and deliver any and all additional or other instruments, documents or papers, including but not limited to: the execution of instruments to effect the Assignment provisions of this Agreement, the execution of UCC forms, the endorsement of checks or other instruments payable to any of the Undersigned deemed necessary and proper by the Surety in order to give full effect to the intent and meaning of the within Assignment provisions of this Agreement for the full protection intended to be given to the Surety under all provisions of this Agreement. The Undersigned hereby ratify and affirm all acts and actions taken and done by the Surety or its designee as attorney-in-fact.

9. WAIVER OF NOTICE – The Undersigned agree that the Surety need not give us, or any of us, notice of any act, fact or information coming to the notice or knowledge of the Surety concerning or affecting its rights or liabilities under any such Bond or our rights or liabilities hereunder, notice of all such being hereby expressly waived.

10. WAIVERS – The Undersigned hereby waive and agree not to assert:

10.1 Any defense that this Agreement was executed subsequent to the date of any Bond, admit and covenant that any Bond issued by Surety was executed pursuant to the request of the Undersigned and in reliance on the promise of the Undersigned to execute and perform this Agreement. And that the Undersigned are beneficially interested in the subject of such bonds in the bond required and the continuation thereof.

10.2 Any right to claim that any property, including homesteads, is exempt from levy, execution, sale or other legal process under the laws of any state, territory or possession in any action brought by Surety under this Agreement.

10.3 Any right to require Surety to proceed against any of the Undersigned or any other person, firm or entity or to proceed against or exhaust any security held by surety at any time or to pursue any other remedy in Surety's power. Without in any way limiting the generality of the foregoing, if property of an Undersigned is hypothecated with property of Principal or of any other party, Undersigned hereby waives any right to have the property of Principal or of such other party first applied towards the discharge of the obligations hereunder.

10.4 Any defense relating to the defense of the statute of limitations in any action hereunder or for the collection of any claim or the performance of any obligation indemnified hereby.

Indemnitor to initial each page Initial ______ ______

10.5 Any defense base[illegible] on [illegible] election of remedies by Surety, ag[illegible] any of them or all (including, without limitation, election by Surety [illegible] its right under the power of sale [illegible] Deed of Trust given as security for the performance of the ob[illegible]gations hereunder), which election may destro[illegible] or otherwise impair subrogation rights of the Undersigned or the right of any Undersigned to proceed against Principal or to realize upon any security whether such destruction or impairment of subrogation results from the operation of anti-deficiency statutes or otherwise.

10.6 Any defense based upon any legal disability or other defense of any Undersigned or other person, or by reason of the cessation or limitation of the liability of Principal from any cause other than full payment of all sums payable under this Agreement.

10.7 Any defense based upon any lack of authority of the officers, directors, partners or agents acting or purporting to act on behalf of Principal or any principal of Principal of any defect in the formation of Principal or any principal of Principal.

10.8 Any defense based upon Surety's failure to disclose to any Undersigned any information concerning Principal's financial condition or any other circumstances bearing on Principal's ability to pay all sums payable under the Agreement.

10.9 Any defense based upon any statute or rule of law which provides that the obligations of a Surety must be neither larger in amount nor in any other respects more burdensome that that of a principal.

10.10 Any right of subrogation, any right to enforce any remedy which Surety may have against Principal and any right to participate in, or benefit from, any security for the obligations hereunder held by Surety.

11. TERMINATION – Except with respect to any Bond within the scope of another indemnity agreement, this Agreement may be terminated as follows:

11.1 This Agreement is a continuing obligation of the Undersigned unless terminated by written notice to Surety as hereinafter provided. Such termination by a particular Undersigned shall in no way affect the obligation of any other Undersigned who has not given such notice. In order to terminate liability as to future Bonds of Principal, an Undersigned must:

11.1.1 Give written notice by means of certified mail to Surety at its office at 9841 Airport Boulevard, 9th Floor, Los Angeles, California 90045; and

11.1.2 State in such notice the effective date (not less than thirty days after receipt thereof of Surety) of termination of such Undersigned's liability for future Bonds.

11.2 After the effective date of such termination by giving notice, the Undersigned shall nonetheless be liable hereunder for:

11.2.1 Bonds executed or authorized prior to such effective date, and renewals, substitutions and extensions thereof; and

11.2.2 Bonds executed pursuant to a bid or proposal Bonds executed or authorized prior to such effective date, and renewals, substitutions and extensions thereof; and

11.2.3 Any maintenance or guarantee Bonds executed incidental to any other Bond executed prior to such effective date, and renewals, substitutions and extensions thereof.

12. GENERAL PROVISIONS

12.1 The obligations of the Undersigned hereunder are joint and several. Surety may bring separate suits hereunder against any of the Undersigned as causes of action may accrue hereunder. Surety need not proceed first against the Principal.

12.2 Undersigned shall, on request to Surety, procure the discharge of Surety from any Bond, and all liability by reason thereof.

12.3 Undersigned warrant that each of them is specifically and beneficially interested in obtaining each Bond and agree to pay the initial, renewal, and additional premiums thereon, including premiums based on overrun in contract price according to the current rate charged by Surety recognizing that the initial premium is fully earned upon execution of said Bond.

12.4 Undersigned waive notice of any Default, the making of a claim against Surety, or Surety's loaning funds to Principal.

12.5 Undersigned agree to give to Surety prompt notice of any facts which might give rise to any claims or suits against Surety upon any Bond.

12.6 Surety shall have the right, at its option and in its sole discretion, to issue or cancel or decline the execution of any Bond, or renewal thereof, including a final Bond when it has furnished a bid Bond.

12.7 Surety may consent to any changes or alterations in any Contract or Bond, without affecting the liability hereunder of the Undersigned, including but not limited to, riders extending the time of completion, or increase or decrease

in the penal sum of the Bond. T' 'nd' 'gned hereby agree to pay any additic 're' 'n resulting from said changes or alterations, without giving r ...ecor to the Undersigned.

12.8 Surety shall have every right, defense, or remedy which a personal Surety without compensation would have, including the right of exoneration.

12.9 Until Surety shall have been furnished with conclusive evidence of its discharge without loss from any Bonds, and until Surety has been otherwise fully indemnified hereunder provided, Surety shall have right of free access to the books, records and accounts of the Undersigned for the purpose of examining and copying them. The Undersigned hereby authorizes third parties, including but not limited to depositories of funds of the Undersigned, to furnish to Surety any information requested by Surety in connection with any transaction. Surety may furnish any information, which it now has or may hereafter acquire concerning the Undersigned, to other persons, firms or entities for the purpose of procuring co-suretyship or reinsurance or of advising such persons, firms, or entities as it may deem appropriate.

12.10 If the execution of this Agreement by any of the Undersigned be found defective or invalid for any reason, such defect or invalidity shall not affect the validity of this Agreement with respect to any of the other Undersigned. The invalidity of any provision of this Agreement by reason of the law of any state or by any other reason shall not affect the validity of any other provision of this Agreement.

12.11 The Surety may, at its option, file or record this Agreement or any other document executed by any or all the Undersigned, individually or jointly, in connection with the application, issuance or execution of any Bond or Bonds, or renewal thereof, coming within the scope of this Agreement as: a security agreement or as part of a financing statement or, as notice of its prior interest and assignment under the provisions of the Uniform Commercial Code or any other statute, ordinance or regulation of any jurisdiction or agency. The filing or recording of such document shall be solely at the option of the Surety. The failure to so file shall not release or discharge any of the obligations of the Undersigned under this Agreement.

12.12 The Surety shall have the right to fill in any blanks left herein and to correct any errors in filling in any blanks herein.

12.13 Each of the Undersigned further affirms that it understands Bonds are a credit relationship, and hereby authorizes and empowers Surety, or any of Surety's authorized agents, to gather such credit information as the Surety deems necessary and appropriate for purposes of evaluating whether such credit should be granted or continued, or for the review or collection of any obligation of the Undersigned to surety, or for any other purpose authorized by law.

12.14 This Agreement may not be changed or modified orally. No change or modification shall be effective unless specifically agreed in writing by an officer of the Company.

12.15 In the event any of the Undersigned shall fail to execute this Agreement or become insolvent, or in the event any of the Undersigned who execute this Agreement, shall not be bound for any reason, the other Undersigned shall, nevertheless, be bound hereunder for the full amount of the liability as aforesaid.

12.16 Repeated actions may be maintained by Surety on this Agreement as breaches of it occur without any former action operating as a bar to any subsequent action.

12.17 The liability of the Undersigned hereunder shall not be affected by: (i) the failure of the Principal to sign any bond, (ii) any claim that other indemnity or security was to have been obtained, (iii) the release of any indemnity, (iv) the return or exchange of any collateral that may have been obtained.

12.18 If any of the Bonds are executed in connection with a contract which by its terms or by law prohibits the assignment of the contract proceeds or any part thereof, the Undersigned covenant and agree that all payments received for or on account of said contract shall be held as a trust fund in which the Surety has an interest for the payment of obligations incurred in the performance of the contract and for labor, materials, and services furnished in the prosecution of the work provided in said contract or any authorized extension or modification thereof; and further, it is expressly understood and declared that all monies due or to be come due under ay contract or contracts covered by the Bonds are trust funds, whether in the possession of the Undersigned or otherwise, for the benefit of and for payment of all such obligations in connection with any contract or contracts for which the Surety should be liable under any of said Bonds, and this agreement and declaration shall also constitute notice of such trust.

12.19 Undersigned has established adequate means of obtaining from sources other than Surety, on a continuing basis, financial and other information pertaining to Principal's financial condition and the status of Principal's performance of any Contract with respect to each Bond covered hereby, and Undersigned agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect Undersigned's risks hereunder and Surety has made no representations with respect to such matters.

12.20 By exercising or failing to exercise any of its rights, options or ...ns hereunder, surety shall not be deemed to have waived any breach or default on the part of any of the Undersi... have released any Undersigned from any of their obligations hereunder, unless such waiver or release is in wri... ...rety. In addition, the

default. ... waiver of any succeeding breach or

12.21 The obliga... s of the Undersigned hereunder shall be in a... ...tion to and shall not limit or in any way affect the obligations of any Undersigned under any other existing or future indemnities, guarantees, collateral agreements, reimbursement agreements or any other agreements, unless said other indemnities, guarantees, collateral security agreements, reimbursement agreements or any other agreements are expressly modified or revoked in writing.

12.22 Any indebtedness or Principal now or hereafter held by any of the Undersigned is hereby subordinated to the indebtedness of Principal to Surety, and such indebtedness of Principal to Surety, and such indebtedness of Principal to any of the Undersigned shall, if Surety so requests, be collected, enforced and received by the Undersigned as trustee for Surety and be paid over to Surety on account of the indebtedness of Principal to Surety, but without reducing or limiting in any manner the liability of any of the Undersigned under the other provisions of the Agreement.

12.23 This Agreement may be executed in any number of counterparts, each of which shall be deemed an original hereof and all of which, taken together, shall constitute but one and the same documents. The liability of the Undersigned hereunder as to the future Bonds of Principal shall not terminate by reason of the failure of Surety to disclose facts known about the Principal, even though such facts materially increase the risk beyond that which the Undersigned believe such facts are unknown to the Undersigned, or whether Surety may have reasonable opportunity to communicate such facts to the Undersigned, the Undersigned hereby waive notice of such facts.

12.24 This Agreement shall be governed by and construed in accordance with the laws of the State of California.

12.25 It is understood and agreed by the Undersigned that the rights, powers and remedies given the Surety under this agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers and remedies which the Surety may have or acquire against the Undersigned or others whether by the terms of any other agreement or by operation of law or otherwise.

IN WITNESS WHEREOF, the Undersigned, intending to be legally bound hereby, have executed this Agreement. Corporate and all individual signatures must be acknowledged by a notary.

Principal(s): Digiovannis Insulation & Refractory, Inc.

Emile Digiovanni-president
Name and Title
By [signature]

251 Garden Rd, River Ridge La 70123
Address

Janet Digiovanni-sec/treasure
Name and Title
By [signature]

251 Garden Rd, River Ridge La 70123
Address

Name and Title
By

Address

Indemnitors:

Emile Digiovanni
[signature]

251 Garden Rd, River Ridge La 70123
Address

Janet Digiovanni
[signature]

Address
251 Garden Rd, River Ridge, La. 70123
Address

Address

Address

Address

STATE OF Louisiana )
) ss.
~~COUNTY~~ Parish OF East Baton Rouge )

On this 20th day of Aug. in the year 02, before me, John Sonnier Jr, a Notary Public, State of Louisiana, duly commissioned and sworn, personally appeared Emilie Digiovanni, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

(Seal)

Notary Public, State of Louisiana
My commission expires Life

---

STATE OF Louisiana )
) ss.
~~COUNTY~~ Parish OF East Baton Rouge )

On this 20th day of August in the year 02, before me, John Sonnier Jr, a Notary Public, State of Louisiana, duly commissioned and sworn, personally appeared Janet Digiovanni, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

(Seal)

Notary Public, State of Louisiana
My commission expires Life

---

STATE OF Louisiana )
) ss.
~~COUNTY~~ Parish OF East Baton Rouge )

On this 20th day of August in the year 02, before me, John Sonnier Jr, a Notary Public, State of Louisiana, duly commissioned and sworn, personally appeared Emilie Digiovanni - president, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

(Seal)

Notary Public, State of Louisiana
My commission expires Life

---

STATE OF ________ )
) ss.
COUNTY OF ________ )

On this ____ day of ________ in the year ____, before me, ____________, a Notary Public, State of ________, duly commissioned and sworn, personally appeared ____________, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

(Seal)

Notary Public, State of ________
My commission expires ________

---

STATE OF ________ )
) ss.
COUNTY OF ________ )

On this ____ day of ________ in the year ____, before me, ____________, a Notary Public, State of ________, duly commissioned and sworn, personally appeared ____________, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

(Seal)

Notary Public, State of ________

# EXHIBIT

# 3

1997 EDITION

# AIA DOCUMENT A107-1997

## *Abbreviated Standard Form of Agreement Between Owner and Contractor for Construction Projects of Limited Scope where the basis of payment is a STIPULATED SUM*

This document includes abbreviated General Conditions and should not be used with other general conditions.

**AGREEMENT** made as of the THIRTEENTH day of SEPTEMBER in the year 2002
*(In words, indicate day, month and year)*

EPD 5th

**BETWEEN** the Owner:
*(Name, address and other information)*

STEVE HO
3813 N. ARNAULT ROAD
METAIRIE, LA. 70002

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

and the Contractor:
*(Name, address and other information)*

DIOIOVANNI'S INSULATION & REFRACTORY, INC.
251 GARDEN ROAD
RIVER RIDGE, LA. 70123

This document has been approved and endorsed by The Associated General Contractors of America.

The Project is:
*(Name and location)*

HOSHUN CHINESE CUISINE
ALTERATIONS AND ADDITIONS TO THE BUILDING
1601 ST. CHARLES AVENUE
NEW ORLEANS, LA. 70110

The Architect is:
*(Name, address and other information)*

TERRY G. SCHELLHAAS
1704 LOUMAR AVENUE
METAIRIE, LA. 70001

The Owner and Contractor agree as follows.

EXHIBIT 3

© 1997 AIA®
AIA DOCUMENT A107-1997
ABBREVIATED OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

December 20, 2001

Steve Ho
3813 N. Arnoult Road
Metairie, LA 70002

Re: Hashun Chinese Cuisine
Alterations and additions to the building
1601 St. Charles Ave.
New Orleans, La. 70130

Dear Sir:

We propose to furnish all labor, material, insurance, and supervision to provide a complete exterior shell and addition, complete interior finish restaurant and second floor meeting room according to plans and specification by Terry Schellhaas Architect dated February 1, 2001, and addendum #1 dated December 20, 2001, for the sum of one million nine hundred forty thousand dollars.
(FIFTY EPD)

The above estimate includes the following allowances:

1. Case work, bars, booths, and toilet partitions ....$30,000.00
2. Entergy cost for relocating power poles ..........$20,000.00
3. Fire and burglar alarm ..............................$15,000.00

EPD SH

Please note:
This estimate does not include any kitchen equipment, hood fans, duct work, hood, ansel system, or furnishings. (HOOD)

Thank you for this opportunity to submit a bid on this project and if any further information is needed please call.

Very truly yours,

Emile P. Di Giovanni

P.S. To eliminate second floor meeting room finishes, deduct <$60,000.00>

## ARTICLE 1 THE WORK OF THIS CONTRACT

The Contractor shall fully execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others.

## ARTICLE 2 DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

**2.1** The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.
*(Insert the date of commencement, if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

**2.2** The Contract Time shall be measured from the date of commencement.

**2.3** The Contractor shall achieve Substantial Completion of the entire Work not later than 270 CALENDAR days from the date of commencement, or as follows:
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. Unless stated elsewhere in the Contract Documents, insert any requirements for earlier Substantial Completion of certain portions of the Work.)*

CONTRACT TIME MAY AVRY BECAUSE OF WHEATHER CONDITIONS AND CHANGE ORDERS

, subject to adjustments of this Contract Time as provided in the Contract Documents.
*(Insert provisions, if any, for liquidated damages relating to failure to complete on time or for bonus payments for early completion of the Work.)*

## ARTICLE 3 CONTRACT SUM

**3.1** The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum shall be ONE MILLION SEVEN HUNDRED EIGHTY ONE THOUSAND EIGHT HUNDRED FIFTY DOLLARS Dollars ($ 1,281.850.00 ), subject to additions and deletions as provided in the Contract Documents.

1,781,850.00

© 1997 AIA®
AIA DOCUMENT A107-1997
ABBREVIATED OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.

**3.2** The Contract Sum is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:
*(State the numbers or other identification of accepted alternates. If decisions on other alternates are to be made by the Owner subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when that amount expires.)*

**3.3** Unit prices, if any, are as follows:

## ARTICLE 4 PAYMENTS

### 4.1 PROGRESS PAYMENTS

**4.1.1** Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents. The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

**4.1.2** Provided that an Application for Payment is received by the Architect not later than the 25th day of a month, the Owner shall make payment to the Contractor not later than the 10th day of the FOLLOWING month. If an Application for Payment is received by the Architect after the date fixed above, payment shall be made by the Owner not later than FIFTEEN XX ... Architect receives the Application for Payment.

© 1997 AIA®
AIA DOCUMENT A107-1997
ABBREVIATED OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.

The Construction Bid is based on:

The Original Set of Construction Documents dated 2/1/01 which includes:

- Sheets 0 – 23
  47 – 66
  S1 – S5
  P1 – P5
  M1 – M6
  E1 – E8
  Specification Booklet

- Reference Construction Documents for the Burroughs Corporation

- Letter to Mr. John Laudun
  Office of State Fire Marshal
  March 16, 2001

- Letter to Mr. John Laudun
  Office of State Fire Marshal
  April 10, 2001

- Letter to Mr. John Laudun
  Office of State Fire Marshal
  May 24, 2001

- Letter to Mr. Clourth Wilson
  City of New Orleans
  March 29, 2001

- Letter to Mr. Clourth Wilson
  City of New Orleans
  May 24, 2001

- Sheets 24 – 46 were replaced by the following Revised Sheets dated 6/13/01:
  24, 26, 27, 28, 31, 32, 33, 36, 37, 38

- Addendum #1 from the General Contractor – Di Giovanni 10/20/01

- Future Addendum after City Planning Commission approval

E.P. D.
S.H.

**4.1.3** Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Contractor's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

**4.2 FINAL PAYMENT**

**4.2.1** Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:

.1 the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Paragraph 17.2, and to satisfy other requirements, if any, which extend beyond final payment; and

.2 a final Certificate for Payment has been issued by the Architect.

**4.2.2** The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

## ARTICLE 5 ENUMERATION OF CONTRACT DOCUMENTS

**5.1** The Contract Documents are listed in Article 6 and, except for Modifications issued after execution of this Agreement, are enumerated as follows:

**5.1.1** The Agreement is this executed 1997 edition of the Abbreviated Standard Form of Agreement Between Owner and Contractor, AIA Document A107-1997.

**5.1.2** The Supplementary and other Conditions of the Contract are those contained in the Project Manual dated , and are as follows:

| Document | Title | | Pages |
|---|---|---|---|
| | THE ORIGIONAL SET OF CONSTRUCTION DOCUMENTS DATED 2/1/0/ EPD S.H. | SHEETS | 0 -23<br>47-66<br>S1-S5<br>P1-P5<br>M1-M6<br>E1-E6 |

SPECIFICATION BOOKLET

© 1997 AIA®


The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

5.1.3 The Specifications are those contained in the Project Manual dated as in Subparagraph 5.1.2, and are as follows:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

Section Title Pages

CONSTRUCTION DOCUMENTS FOR THE BURROUGHS CORPORATION

SHEETS 24 - 46 WERE REPLACED BY THE FOLLOWINF REVISED SHEETS DATED 6/13/01 24,26,27,28,31,32,33,36,37,38

5.1.4 The Drawings are as follows, and are dated unless a different date is shown below:
*(Either list the Drawings here or refer to an exhibit attached to this Agreement.)*

Number Title Pages

5.1.5 The Addenda, if any, are as follows:

Number 1: Date 12/20/01 Pages 1

GENERAL CONTRACTOR
DIGIOVANNI

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 5.

5.1.6 Other documents, if any, forming part of the Contract Documents are as follows:
*(List any additional documents which are intended to form part of the Contract Documents.)*

©1997 AIA®
AIA DOCUMENT A107-1997
ABBREVIATED OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

December 20, 2001

Addendum #1

Changes and additions to plans and specifications for:
Hoshun Chinese Cuisine
1601 St. Charles Ave.
New Orleans, La. 70118

1. EIFS to ¾" plaster
2. Pan on roof, mud bed, and Quarry tile walkway
3. Light fixture schedule
4. Platforms in dining area to be concrete
5. Allowance for bars and booths
6. Water meter and off site utilities relocation by owner
7. Under side of galleries are exposed bar joist and pans painted
8. Sprinklers included
9. Entergy relocation allowance
10. All exterior walls to be 6" metal studs

E.P.D.
S.H.

GENERAL CONDITIONS

## ARTICLE 6 GENERAL PROVISIONS

### 6.1 THE CONTRACT DOCUMENTS

The Contract Documents consist of this Agreement with Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to the execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement. A Modification is (1) a written amendment to the Contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Architect. The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results.

### 6.2 THE CONTRACT

The Contract Documents form the Contract for Construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification. The Contract Documents shall not be construed to create a contractual relationship of any kind (1) between the Architect and Contractor, (2) between the Owner and a Subcontractor or sub-subcontractor, (3) between the Owner and Architect or (4) between any persons or entities other than the Owner and Contractor.

### 6.3 THE WORK

The term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

### 6.4 EXECUTION OF THE CONTRACT

Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become generally familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents.

### 6.5 OWNERSHIP AND USE OF ARCHITECT'S DRAWINGS, SPECIFICATIONS AND OTHER INSTRUMENTS OF SERVICE

The Drawings, Specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service through which the Work to be executed by the Contractor is described. The Contractor may retain one record set. Neither the Contractor nor any Subcontractor, sub-subcontractor or material or equipment supplier shall own or claim a copyright in the Drawings, Specifications and other documents prepared by the Architect or the Architect's consultants, and unless otherwise indicated the Architect and the Architect's consultants shall be deemed the authors of them and will retain all common law, statutory and other reserved rights, in addition to the copyrights. All copies of them, except the Contractor's record set, shall be returned or suitably accounted for to the Architect, on request, upon completion of the Work. The Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants, and copies thereof furnished to the Contractor, are for use solely with respect to this Project. They are not to be used by the Contractor or any Subcontractor, sub-subcontractor or material or equipment supplier on other projects or for additions to this Project outside the scope of the Work without the specific written consent of the Owner, Architect and the Architect's consultants. The Contractor, Subcontractors,

©1997 AIA®


The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

## GENERAL CONDITIONS

## ARTICLE 6 GENERAL PROVISIONS

### 6.1 THE CONTRACT DOCUMENTS

The Contract Documents consist of this Agreement with Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to the execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement. A Modification is (1) a written amendment to the Contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Architect. The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results.

### 6.2 THE CONTRACT

The Contract Documents form the Contract for Construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification. The Contract Documents shall not be construed to create a contractual relationship of any kind (1) between the Architect and Contractor, (2) between the Owner and a Subcontractor or sub-subcontractor, (3) between the Owner and Architect or (4) between any persons or entities other than the Owner and Contractor.

### 6.3 THE WORK

The term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

### 6.4 EXECUTION OF THE CONTRACT

Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become generally familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents.

### 6.5 OWNERSHIP AND USE OF ARCHITECT'S DRAWINGS, SPECIFICATIONS AND OTHER INSTRUMENTS OF SERVICE

The Drawings, Specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service through which the Work to be executed by the Contractor is described. The Contractor may retain one record set. Neither the Contractor nor any Subcontractor, sub-subcontractor or material or equipment supplier shall own or claim a copyright in the Drawings, Specifications and other documents prepared by the Architect or the Architect's consultants, and unless otherwise indicated the Architect and the Architect's consultants shall be deemed the authors of them and will retain all common law, statutory and other reserved rights, in addition to the copyrights. All copies of them, except the Contractor's record set, shall be returned or suitably accounted for to the Architect, on request, upon completion of the Work. The Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants, and copies thereof furnished to the Contractor, are for use solely with respect to this Project. They are not to be used by the Contractor or any Subcontractor, sub-subcontractor or material or equipment supplier on other projects or for additions to this Project outside the scope of the Work without the specific written consent of the Owner, Architect and the Architect's consultants. The Contractor, Subcontractors,

© 1997 AIA ®


The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

sub-subcontractors and material or equipment suppliers are authorized to use and reproduce applicable portions of the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants appropriate to and for use in the execution of their Work under the Contract Documents. All copies made under this authorization shall bear the statutory copyright notice, if any, shown on the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants. Submittal or distribution to meet official regulatory requirements or for other purposes in connection with this Project is not to be construed as publication in derogation of the Architect's or Architect's consultants' copyrights or other reserved rights.

## ARTICLE 7 OWNER

### 7.1 INFORMATION AND SERVICES REQUIRED OF THE OWNER

7.1.1 The Owner shall furnish and pay for surveys and a legal description of the site.

7.1.2 The Contractor shall be entitled to rely on the accuracy of information furnished by the Owner but shall exercise proper precautions relating to the safe performance of the Work.

7.1.3 Except for permits and fees which are the responsibility of the Contractor under the Contract Documents, the Owner shall secure and pay for other necessary approvals, easements, assessments and charges required for the construction, use or occupancy of permanent structures or permanent changes in existing facilities.

### 7.2 OWNER'S RIGHT TO STOP THE WORK

If the Contractor fails to correct Work which is not in accordance with the requirements of the Contract Documents, or persistently fails to carry out the Work in accordance with the Contract Documents, the Owner may issue a written order to the Contractor to stop the Work, or any portion thereof, until the cause for such order is eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Contractor or any other person or entity.

### 7.3 OWNER'S RIGHT TO CARRY OUT THE WORK

If the Contractor defaults or persistently fails or neglects to carry out the Work in accordance with the Contract Documents, or fails to perform a provision of the Contract, the Owner, after 10 days' written notice to the Contractor and without prejudice to any other remedy the Owner may have, may make good such deficiencies and may deduct the reasonable cost thereof, including Owner's expenses and compensation for the Architect's services made necessary thereby, from the payment then or thereafter due the Contractor.

## ARTICLE 8 CONTRACTOR

### 8.1 REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY CONTRACTOR

8.1.1 Since the Contract Documents are complementary, before starting each portion of the Work, the Contractor shall carefully study and compare the various Drawings and other Contract Documents relative to that portion of the Work, as well as the information furnished by the Owner pursuant to Subparagraph 7.1.1, shall take field measurements of any existing conditions related to that portion of the Work and shall observe any conditions at the site affecting it. These obligations are for the purpose of facilitating construction by the Contractor and are not for the purpose of discovering errors, omissions or inconsistencies in the Contract Documents; however, any errors, omissions or inconsistencies discovered by the Contractor shall be reported promptly to the Architect as a request for information in such form as the Architect may require.

8.1.2 Any design errors or omissions noted by the Contractor during this review shall be reported promptly to the Architect, but it is recognized that the Contractor's review is made in the Contractor's capacity as a contractor and not as a licensed design professional unless otherwise specifically provided in the Contract Documents.

8.2 SUPERVISION AND CONSTRUCTION PROCEDURES

8.2.1 The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, the Contractor shall be fully and solely responsible for the jobsite safety thereof unless the Contractor gives timely written notice to the Owner and Architect that such means, methods, techniques, sequences or procedures may not be safe.

8.2.2 The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors.

8.3 LABOR AND MATERIALS

8.3.1 Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

8.3.2 The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Contract. The Contractor shall not permit employment of unfit persons or persons not skilled in tasks assigned to them.

8.3.3 The Contractor shall deliver, handle, store and install materials in accordance with manufacturers' instructions.

8.3.4 The Contractor may make substitutions only with the consent of the Owner, after evaluation by the Architect and in accordance with a Change Order.

8.4 WARRANTY

The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform with the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Contractor, improper or insufficient maintenance, improper operation or normal wear and tear and normal usage.

8.5 TAXES

The Contractor shall pay sales, consumer, use and other similar taxes which are legally enacted when bids are received or negotiations concluded.

© 1997 AIA ®

**8.6 PERMITS, FEES AND NOTICES**

8.6.1 Unless otherwise provided in the Contract Documents, the Contractor shall secure and pay for the building permit and other permits and governmental fees, licenses and inspections necessary for proper execution and completion of the Work.

8.6.2 The Contractor shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities applicable to performance of the Work. The Contractor shall promptly notify the Architect and Owner if the Drawings and Specifications are observed by the Contractor to be at variance therewith. If the Contractor performs Work knowing it to be contrary to laws, statutes, ordinances, building codes, and rules and regulations without such notice to the Architect and Owner, the Contractor shall assume appropriate responsibility for such Work and shall bear the costs attributable to correction.

**8.7 SUBMITTALS**

8.7.1 The Contractor shall review for compliance with the Contract Documents, approve in writing and submit to the Architect Shop Drawings, Product Data, Samples and similar submittals required by the Contract Documents with reasonable promptness. The Work shall be in accordance with approved submittals.

8.7.2 Shop Drawings, Product Data, Samples and similar submittals are not Contract Documents.

**8.8 USE OF SITE**

The Contractor shall confine operations at the site to areas permitted by law, ordinances, permits and the Contract Documents and shall not unreasonably encumber the site with materials or equipment.

**8.9 CUTTING AND PATCHING**

The Contractor shall be responsible for cutting, fitting or patching required to complete the Work or to make its parts fit together properly.

**8.10 CLEANING UP**

The Contractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Contract. At completion of the Work, the Contractor shall remove from and about the Project waste materials, rubbish, the Contractor's tools, construction equipment, machinery and surplus material.

**8.11 ROYALTIES, PATENTS AND COPYRIGHTS**

The Contractor shall pay all royalties and license fees; shall defend suits or claims for infringement of copyrights and patent rights and shall hold the Owner and Architect harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Contract Documents, or where the copyright violations are contained in Drawings, Specifications or other documents prepared by the Owner or Architect, unless the Contractor has reason to believe that there is an infringement of patent or copyright and fails to promptly furnish such information to the Architect.

**8.12 ACCESS TO WORK**

The Contractor shall provide the Owner and Architect access to the Work in preparation and progress wherever located.

©1997 AIA®
AIA DOCUMENT A107-1997
ABBREVIATED OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**8.13 INDEMNIFICATION**

**8.13.1** To the fullest extent permitted by law and to the extent claims, damages, losses or expenses are not covered by Project Management Protective Liability insurance purchased by the Contractor in accordance with Paragraph 16.3, the Contractor shall indemnify and hold harmless the Owner, Architect, Architect's consultants and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Paragraph 8.13.

**8.13.2** In claims against any person or entity indemnified under this Paragraph 8.13 by an employee of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Subparagraph 8.13.1 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or Subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

## ARTICLE 9 ARCHITECT'S ADMINISTRATION OF THE CONTRACT

**9.1** The Architect will provide administration of the Contract and will be an Owner's representative (1) during construction, (2) until final payment is due and (3) with the Owner's concurrence, from time to time during the one-year period for correction of Work described in Paragraph 17.2.

**9.2** The Architect, as a representative of the Owner, will visit the site at intervals appropriate to the stage of the Contractor's operations (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect will neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents, except as provided in Subparagraph 8.2.1.

**9.3** The Architect will not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect will not have control over or charge of and will not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or any other persons or entities performing portions of the Work.

**9.4** Based on the Architect's evaluations of the Work and of the Contractor's Applications for Payment, the Architect will review and certify the amounts due the Contrac'or and will issue Certificates for Payment in such amounts.

**9.5** The Architect will have authority to reject Work that does not conf Documents.

© 1997 AIA ®


American Institute
'chitects
New York Avenue, N.W.
ington, D.C. 20006-5292

9.6 The Architect will review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents.

9.7 The Architect will interpret and decide matters concerning performance under, and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect will make initial decisions on all claims, disputes and other matters in question between the Owner and Contractor but will not be liable for results of any interpretations or decisions so rendered in good faith.

9.8 The Architect's decisions on matters relating to aesthetic effect will be final if consistent with the intent expressed in the Contract Documents.

9.9 Duties, responsibilities and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the Owner, Contractor and Architect. Consent shall not be unreasonably withheld.

**9.10 CLAIMS AND DISPUTES**

9.10.1 Claims, disputes and other matters in question arising out of or relating to this Contract, including those alleging an error or omission by the Architect but excluding those arising under Paragraph 15.2, shall be referred initially to the Architect for decision. Such matters, except those relating to aesthetic effect and except those waived as provided for in Paragraph 9.11 and Subparagraphs 14.5.3 and 14.5.4, shall, after initial decision by the Architect or 30 days after submission of the matter to the Architect, be subject to mediation as a condition precedent to ~~arbitration or~~ the institution of legal or equitable proceedings by either party.

9.10.2 If a claim, dispute or other matter in question relates to or is the subject of a mechanic's lien, the party asserting such matter may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the matter by the Architect, by mediation or by arbitration.

9.10.3 The parties shall endeavor to resolve their disputes by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. ~~The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.~~

9.10.4 Claims, disputes and other matters in question arising out of or relating to the Contract that are not resolved by mediation, except matters relating to aesthetic effect and except those waived as provided for in Paragraph 9.11 and Subparagraphs 14.5.3 and 14.5.4, shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association and shall be made within a reasonable time after the dispute has arisen. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof. Except by written consent of the person or entity sought to be joined, no arbitration arising out of or relating to the Contract Documents shall incl[illegible], by consolidation, joinder or in any other manner, any person or entity not a party to the A[illegible]ent under which

© 1997 AIA®


The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

such arbitration arises, unless it is shown at the time the demand for arbitration is filed that (1) such person or entity is substantially involved in a common question of fact or law, (2) the presence of such person or entity is required if complete relief is to be accorded in the arbitration, (3) the interest or responsibility of such person or entity in the matter is not insubstantial, and (4) such person or entity is not the Architect or any of the Architect's employees or consultants. The agreement herein among the parties to the Agreement and any other written agreement to arbitrate referred to herein shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

9.11 CLAIMS FOR CONSEQUENTIAL DAMAGES

The Contractor and Owner waive claims against each other for consequential damages arising out of or relating to this Contract. This mutual waiver includes:

.1 damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

.2 damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work.

This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 19. Nothing contained in this Paragraph 9.11 shall be deemed to preclude an award of liquidated direct damages, when applicable, in accordance with the requirements of the Contract Documents.

## ARTICLE 10 SUBCONTRACTORS

10.1 A Subcontractor is a person or entity who has a direct contract with the Contractor to perform a portion of the Work at the site.

10.2 Unless otherwise stated in the Contract Documents or the bidding requirements, the Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner through the Architect the names of the Subcontractors for each of the principal portions of the Work. The Contractor shall not contract with any Subcontractor to whom the Owner or Architect has made reasonable and timely objection. If the proposed but rejected Subcontractor was reasonably capable of performing the Work, the Contract Sum and Contract Time shall be increased or decreased by the difference, if any, occasioned by such change, and an appropriate Change Order shall be issued before commencement of the substitute Subcontractor's Work. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

10.3 Contracts between the Contractor and Subcontractors shall (1) require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by the terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work, which the Contractor, by the Contract Documents, assumes toward the Owner and Architect, and (2) allow the Subcontractor the benefit of all rights, remedies and redress afforded to the Contractor by these Contract Documents.

## ARTICLE 11 OWNER'S RIGHT TO PERFORM CONSTRUCTION AND TO AWARD SEPARATE CONTRACTS

11.1 The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and to award separate contracts in connection with other portions

of the Project or other construction or operations on the site under conditions of the contract identical or substantially similar to these, including those portions related to insurance and waiver of subrogation. If the Contractor claims that delay or additional cost is involved because of such action by the Owner, the Contractor shall make such claim as provided in Paragraph 9.10.

11.2 The Contractor shall afford the Owner and separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities, and shall connect and coordinate the Contractor's activities with theirs as required by the Contract Documents.

11.3 The Owner shall be reimbursed by the Contractor for costs incurred by the Owner which are payable to a separate contractor because of delays, improperly timed activities or defective construction of the Contractor. The Owner shall be responsible to the Contractor for costs incurred by the Contractor because of delays, improperly timed activities, damage to the Work or defective construction of a separate contractor.

## ARTICLE 12 CHANGES IN THE WORK

12.1 The Owner, without invalidating the Contract, may order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly. Such changes in the Work shall be authorized by written Change Order signed by the Owner, Contractor and Architect, or by written Construction Change Directive signed by the Owner and Architect.

12.2 The cost or credit to the Owner from a change in the Work shall be determined by mutual agreement of the parties or, in the case of a Construction Change Directive, by the Contractor's cost of labor, material, equipment, and reasonable overhead and profit.

12.3 The Architect will have authority to order minor changes in the Work not involving adjustment in the Contract Sum or extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes shall be effected by written order and shall be binding on the Owner and Contractor. The Contractor shall carry out such written orders promptly.

12.4 If concealed or unknown physical conditions are encountered at the site that differ materially from those indicated in the Contract Documents or from those conditions ordinarily found to exist, the Contract Sum and Contract Time shall be equitably adjusted.

## ARTICLE 13 TIME

13.1 Time limits stated in the Contract Documents are of the essence of the Contract. By executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work.

13.2 The date of Substantial Completion is the date certified b[illegible] ect in accordance with Subparagraph 14.4.2.

13.3 If the Contractor is delayed at any time in the commencement or progress of the Work by changes ordered in the Work, by labor disputes, fire, unusual delay in deliveries, abnormal adverse weather conditions not reasonably anticipatable, unavoid[illegible] casualties or any causes beyond the Contractor's control, or by oth[illegible] uses which the Archit[illegible] rmines may justify delay, then the Contract Time shall be exten[illegible] Chang[illegible] ble time a[illegible] he Architect may determine, subject to the pr[illegible]

©1997 AIA®
AIA DOCUMENT A107-1997
ABBREVIATED OWNER-CONTRACTOR AGREEMENT
The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

## ARTICLE 14 PAYMENTS AND COMPLETION

### 14.1 APPLICATIONS FOR PAYMENT

14.1.1 Payments shall be made as provided in Article 4 of this Agreement. Applications for Payment shall be in a form satisfactory to the Architect.

14.1.2 The Contractor warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment. The Contractor further warrants that upon submittal of an Application for Payment all Work for which Certificates for Payment have been previously issued and payments received from the Owner shall, to the best of the Contractor's knowledge, information and belief, be free and clear of liens, claims, security interests or other encumbrances adverse to the Owner's interests.

### 14.2 CERTIFICATES FOR PAYMENT

14.2.1 The Architect will, within seven days after receipt of the Contractor's Application for Payment, either issue to the Owner a Certificate for Payment, with a copy to the Contractor, for such amount as the Architect determines is properly due, or notify the Contractor and Owner in writing of the Architect's reasons for withholding certification in whole or in part as provided in Subparagraph 14.2.3.

14.2.2 The issuance of a Certificate for Payment will constitute a representation by the Architect to the Owner, based on the Architect's evaluations of the Work and the data comprising the Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to correction of minor deviations from the Contract Documents prior to completion and to specific qualifications expressed by the Architect. The issuance of a Certificate for Payment will further constitute a representation that the Contractor is entitled to payment in the amount certified. However, the issuance of a Certificate for Payment will not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) made examination to ascertain how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

14.2.3 The Architect may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Owner, if in the Architect's opinion the representations to the Owner required by Subparagraph 14.2.2 cannot be made. If the Architect is unable to certify payment in the amount of the Application, the Architect will notify the Contractor and Owner as provided in Subparagraph 14.2.1. The Architect may also withhold a Certificate for Payment or, because of subsequently discovered evidence, may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect's opinion to protect the Owner from loss for which the Contractor is responsible, including loss resulting from acts and omissions described in Subparagraph 8.2.2, because of:

.1 defective Work not remedied;
.2 third party claims filed or reasonable evidence indicating probable filing of such claims unless security acceptable to the Owner is provided by the Contractor;
.3 failure of the Contractor to make payments properly to Subcontractors or for labor, materials or equipment;
.4 reasonable evidence that the Work cannot be completed for the unpaid balance Contract Sum;
.5 damage to the Owner or another contractor;

© 1997 AIA ®
AIA DOCUMENT A107-1997
ABBREVIATED OWNER-CONTRACTOR AGREEMENT

The American Institute Architects
35 New York Avenue, N.W.
ashington, D.C. 20006-5292

.6 reasonable evidence that the Work will not be completed within the Contract Time and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay; or

.7 persistent failure to carry out the Work in accordance with the Contract Documents.

14.2.4 When the above reasons for withholding certification are removed, certification will be made for amounts previously withheld.

14.3 PAYMENTS TO THE CONTRACTOR

14.3.1 The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor on account of such Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to sub-subcontractors in similar manner.

14.3.2 Neither the Owner nor Architect shall have an obligation to pay or see to the payment of money to a Subcontractor except as may otherwise be required by law.

14.3.3 A Certificate for Payment, a progress payment, or partial or entire use or occupancy of the Project by the Owner shall not constitute acceptance of Work not in accordance with the Contract Documents.

14.4 SUBSTANTIAL COMPLETION

14.4.1 Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use.

14.4.2 When the Architect determines that the Work or designated portion thereof is substantially complete, the Architect will issue a Certificate of Substantial Completion which shall establish the date of Substantial Completion, establish responsibilities of the Owner and Contractor for security, maintenance, heat, utilities, damage to the Work and insurance, and fix the time within which the Contractor shall finish all items on the list accompanying the Certificate. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion. Upon the issuance of the Certificate of Substantial Completion, the Architect will submit it to the Owner and Contractor for their written acceptance of responsibilities assigned to them in such Certificate

14.5 FINAL COMPLETION AND FINAL PAYMENT

14.5.1 Upon receipt of written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Architect will promptly make such inspection and, when the Architect finds the Work acceptable under the Contract Documents and the Contract fully performed, the Architect will promptly issue a final Certificate for Payment stating that to the best of the Architect's knowledge, information and belief, and on the basis of the Architect's on-site visits and inspections, the Work has been completed in accordance with terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor and noted in the final Certificate is due and payable. The Architect's final Certificate for Payment will constitute a further representation that conditions stated in Subparagraph 14.5.2 as precedent to the Contractor's being entitled to final payment have been fulfilled.

14.5.2 Final payment shall not become due until the Contractor has delivered to the Owner a complete release of all liens arising out of this Contract or receipts in full covering all labor,

©1997 AIA®
AIA DOCUMENT A107-1997
ABBREVIATED OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
735 New York Avenue, N.W.
Washington, D.C. 20006-5292

materials and equipment for which a lien could be filed, or a bond satisfactory to the Owner to indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made, the Contractor shall refund to the Owner all money that the Owner may be compelled to pay in discharging such lien, including costs and reasonable attorneys' fees.

14.5.3 The making of final payment shall constitute a waiver of claims by the Owner except those arising from:

.1 liens, claims, security interests or encumbrances arising out of the Contract and unsettled;
.2 failure of the Work to comply with the requirements of the Contract Documents; or
.3 terms of special warranties required by the Contract Documents.

14.5.4 Acceptance of final payment by the Contractor, a Subcontractor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment.

## ARTICLE 15 PROTECTION OF PERSONS AND PROPERTY

### 15.1 SAFETY PRECAUTIONS AND PROGRAMS

The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract. The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to:

.1 employees on the Work and other persons who may be affected thereby;
.2 the Work and materials and equipment to be incorporated therein; and
.3 other property at the site or adjacent thereto.

The Contractor shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on safety of persons and property and their protection from damage, injury or loss. The Contractor shall promptly remedy damage and loss to property caused in whole or in part by the Contractor, a Subcontractor, a sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Contractor is responsible under Subparagraphs 15.1.2 and 15.1.3, except for damage or loss attributable to acts or omissions of the Owner or Architect or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under Paragraph 8.13.

### 15.2 HAZARDOUS MATERIALS

15.2.1 If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner and Architect in writing. When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Contractor. The Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Contractor's reasonable additional costs of shutdown, delay and start-up, which adjustments shall be accomplished as provided in Article 12 of this Agreement.

15.2.2 To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, Subcontractors, Architect, Architect's consultants and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in

©1997 AIA®
AIA DOCUMENT A107-1997
ABBREVIATED OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Subparagraph 15.2.1 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), and provided that such damage, loss or expense is not due to the sole negligence of a party seeking indemnity.

15.2.3 If, without negligence on the part of the Contractor, the Contractor is held liable for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by the Contract Documents, the Owner shall indemnify the Contractor for all cost and expense thereby incurred.

## ARTICLE 16 INSURANCE

16.1 The Contractor shall purchase from and maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located insurance for protection from claims under workers' compensation acts and other employee benefit acts which are applicable, claims for damages because of bodily injury, including death, and claims for damages, other than to the Work itself, to property which may arise out of or result from the Contractor's operations under the Contract, whether such operations be by the Contractor or by a Subcontractor or anyone directly or indirectly employed by any of them. This insurance shall be written for not less than limits of liability specified in the Contract Documents or required by law, whichever coverage is greater, and shall include contractual liability insurance applicable to the Contractor's obligations. Certificates of Insurance acceptable to the Owner shall be filed with the Owner prior to commencement of the Work. Each policy shall contain a provision that the policy will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner.

### 16.2 OWNER'S LIABILITY INSURANCE

The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance.

### 16.3 PROJECT MANAGEMENT PROTECTIVE LIABILITY INSURANCE

16.3.1 Optionally, the Owner may require the Contractor to purchase and maintain Project Management Protective Liability insurance from the Contractor's usual sources as primary coverage for the Owner's, Contractor's and Architect's vicarious liability for construction operations under the Contract. Unless otherwise required by the Contract Documents, the Owner shall reimburse the Contractor by increasing the Contract Sum to pay the cost of purchasing and maintaining such optional insurance coverage, and the Contractor shall not be responsible for purchasing any other liability insurance on behalf of the Owner. The minimum limits of liability purchased with such coverage shall be equal to the aggregate of the limits required for Contractor's Liability insurance under Paragraph 16.1.

16.3.2 To the extent damages are covered by Project Management Protective Liability insurance, the Owner, Contractor and Architect waive all rights against each other for damages, except such rights as they may have to the proceeds of such insurance. The policy shall provide for such waivers of subrogation by endorsement or otherwise.

16.3.3 The Owner shall not require the Contractor to include the Owner, Architect or other persons or entities as additional insureds on the Contractor's Liability insurance under Paragraph 16.1.

### 16.4 PROPERTY INSURANCE

16.4.1 Unless otherwise provided, the Owner shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located,

property insurance on an "all-risk" policy form, including builder's risk, in the amount of the initial Contract Sum, plus the value of subsequent modifications and cost of materials supplied and installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made as provided in Paragraph 14.5 or until no person or entity other than the Owner has an insurable interest in the property required by this Paragraph 16.4 to be covered, whichever is later. This insurance shall include interests of the Owner, the Contractor, Subcontractors and sub-subcontractors in the Project.

16.4.2 The Owner shall file a copy of each policy with the Contractor before an exposure to loss may occur. Each policy shall contain a provision that the policy will not be canceled or allowed to expire, and that its limits will not be reduced, until at least 30 days' prior written notice has been given to the Contractor.

16.5 WAIVERS OF SUBROGATION

16.5.1 The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Architect, Architect's consultants, separate contractors described in Article 11, if any, and any of their subcontractors, sub-subcontractors, agents and employees for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to Paragraph 16.4 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. The Owner or Contractor, as appropriate, shall require of the Architect, Architect's consultants, separate contractors described in Article 11, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

16.5.2 A loss insured under the Owner's property insurance shall be adjusted by the Owner as fiduciary and made payable to the Owner as fiduciary for the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause. The Contractor shall pay Subcontractors their just shares of insurance proceeds received by the Contractor, and by appropriate agreements, written where legally required for validity, shall require Subcontractors to make payments to their sub-subcontractors in similar manner.

## ARTICLE 17 CORRECTION OF WORK

17.1 The Contractor shall promptly correct Work rejected by the Architect or failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspections and compensation for the Architect's services and expenses made necessary thereby, shall be at the Contractor's expense.

17.2 In addition to the Contractor's obligations under Paragraph 8.4, if, within one year after the date of Substantial Completion of the Work or designated portion thereof or after the date for commencement of warranties established under Subparagraph 14.4.2, or by terms of an applicable special warranty required by the Contract Documents, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it

promptly after receipt of written notice from the Owner to do so unless the Owner has previously given the Contractor a written acceptance of such condition. The Owner shall give such notice promptly after discovery of the condition. During the one-year period for correction of Work, if the Owner fails to notify the Contractor and give the Contractor an opportunity to make the correction, the Owner waives the rights to require correction by the Contractor and to make a claim for breach of warranty.

17.3 If the Contractor fails to correct nonconforming Work within a reasonable time, the Owner may correct it in accordance with Paragraph 7.3.

17.4 The one-year period for correction of Work shall be extended with respect to portions of Work first performed after Substantial Completion by the period of time between Substantial Completion and the actual performance of the Work.

17.5 The one-year period for correction of Work shall not be extended by corrective Work performed by the Contractor pursuant to this Article 17.

## ARTICLE 18 MISCELLANEOUS PROVISIONS

### 18.1 ASSIGNMENT OF CONTRACT

Neither party to the Contract shall assign the Contract without written consent of the other.

### 18.2 GOVERNING LAW

The Contract shall be governed by the law of the place where the Project is located.

### 18.3 TESTS AND INSPECTIONS

Tests, inspections and approvals of portions of the Work required by the Contract Documents or by laws, ordinances, rules, regulations or orders of public authorities having jurisdiction shall be made at an appropriate time. Unless otherwise provided, the Contractor shall make arrangements for such tests, inspections and approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority, an[illegible] all bear all related costs of tests, inspections and approvals. The Contractor shall give the Archi[illegible] timely notice of when and where tests and inspections are to be made so that the Architect may be present for such procedures. The Owner shall bear costs of tests, inspections or approvals which do not become requirements until after bids are received or negotiations concluded.

### 18.4 COMMENCEMENT OF STATUTORY LIMITATION PERIOD

As between Owner and Contractor, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued:

.1 not later than the date of Substantial Completion for acts or failures to act occurring prior to the relevant date of Substantial Completion;

.2 not later than the date of issuance of the final Certificate for Payment for acts or failures to act occurring subsequent to the relevant date of Substantial Completion and prior to th[illegible]nce of the final [illegible] for Payment; and

.3 not later tha[illegible] date of the releva[illegible] failure to act by the Contractor for acts or failures to act occurring after the date of the final Certificate for Payment.

## ARTICLE 19 TERMINATION OF THE CONTRACT

### 19.1 TERMINATION BY THE CONTRACTOR

If the Architect fails to recommend payment for a pe[illegible]d of [illegible]gh no fault of the Contractor, or if the Owner [illegible] make pa[illegible]s, the Contractor may, upon seven addition[illegible]t, terminate the

© 1997 AIA®
AIA DOCUMENT A107-1997
ABBREVIATED OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Contract and recover from the Owner payment for Work executed and for proven loss with respect to materials, equipment, tools, and construction equipment and machinery, including reasonable overhead, profit and damages applicable to the Project.

**19.2 TERMINATION BY THE OWNER**

**19.2.1** The Owner may terminate the Contract if the Contractor:

.1 persistently or repeatedly refuses or fails to supply enough properly skilled workers or proper materials;

.2 fails to make payment to Subcontractors for materials or labor in accordance with the respective agreements between the Contractor and the Subcontractors;

.3 persistently disregards laws, ordinances, or rules, regulations or orders of a public authority having jurisdiction; or

.4 otherwise is guilty of substantial breach of a provision of the Contract Documents.

**19.2.2** When any of the above reasons exists, the Owner, upon certification by the Architect that sufficient cause exists to justify such action, may, without prejudice to any other remedy the Owner may have and after giving the Contractor seven days' written notice, terminate the Contract and take possession of the site and of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor and may finish the Work by whatever reasonable method the Owner may deem expedient. Upon request of the Contractor, the Owner shall furnish to the Contractor a detailed accounting of the costs incurred by the Owner in finishing the Work.

**19.2.3** When the Owner terminates the Contract for one of the reasons stated in Subparagraph 19.2.1, the Contractor shall not be entitled to receive further payment until the Work is finished.

**19.2.4** If the unpaid balance of the Contract Sum exceeds costs of finishing the Work, including compensation for the Architect's services and expenses made necessary thereby, and other damages incurred by the Owner and not expressly waived, such excess shall be paid to the Contractor. If such costs and damages exceed the unpaid balance, the Contractor shall pay the difference to the Owner. The amount to be paid to the Contractor or Owner, as the case may be, shall be certified by the Architect, upon application, and this obligation for payment shall survive termination of the Contract.

SEE ATTACHED ARTICLE 20

© 1997 AIA®


The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

20 SW

Article ~~25~~ 20 - Liquidated Damages

In addition to the damages owner may recover from contractor for contractor's unexcused delay in substantially completing the work on or before the time for substantial completion as provided for hereinabove (or as extended in writing by owner), owner shall be entitled to recover liquidated damages from contractor in the amount of $300.00 for each calendar day that substanial completion is delayed. The parties agree that it would be difficult to assess the actual amount of additional damages for such delay, but that stated amount is a reasonable estimate of same.

ARTICLE 20 OTHER CONDITIONS OR PROVISIONS

BID BOND SHALL BE PAID BY THE OWNER- STEVE HO

This Agreement entered into as of the day and year first written above.

OWNER *(Signature)*

SHANG TCHENG HO

STEVE HO

*(Printed name and title)*

CONTRACTOR *(Signature)*

EMILE P. DIGIOVANNI SEC./TREAS.

*(Printed name and title)*

CAUTION: *You should sign an original AIA document or a licensed reproduction. Originals contain the AIA logo printed in red; licensed reproductions are those produced in accordance with the Instructions to this document.*

© 1997 AIA®